UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SUPERIOR SHIPYARD & FABRICATION, INC. | CIVIL ACTION |
| VERSUS | NO: 22-1169 |
| M/V CECILE A. FITCH, her engines, tackle, furniture, equipment, etc. in rem; AND CHESTER J. MARINE, LLC | SECTION: "J"(1) |

## ORDER AND REASONS

Before the Court is a *Motion for Summary Judgment* **(Rec. Doc. 27)** filed by Plaintiff Superior Shipyard & Fabrication Inc. ("Superior Shipyard" or "Plaintiff"). Defendants MV CECIL A FITCH and Chester J. Marine, LLC ("CJM" or "Defendants") filed response memorandum (Rec. Doc. 33). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that Plaintiff's motion **(Rec. Doc. 27)** should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

Superior Shipyard is a marine repair facility located in Golden Meadow, Louisiana. Chester J. Marine, LLC ("Chester Marine") is a Louisiana limited liability company whose sole member is Larry Fitch. Chester Marine owns the tow vessel M/V CECILE A. FITCH. In early November of 2020, Mr. Fitch contacted Superior Shipyard to perform structural and mechanical repairs on the M/V CECILE A. FITCH. On November 20, 2020, Superior Shipyard and Mr. Fitch executed a one-

page Work Order that stated the following description of work: "complete repairs as directed." (Rec. Doc. 27-3). The Work Order also stated that,

> Vessel Owner and/or Operating Company authorizes the signing party to perform all necessary work on their behalf for the above mentioned vessel. Vessel Owner and/or Operating Company accepts full responsibility for all debts incurred from work authorized by signing party and agrees to pay debts incurred within net payment terms of customer's credit account.

*Id.* The Work Order did not provide a price. CJM also alleges that the November 2020 negotiations included a "handshake agreement" for a total estimated cost of $69,860.00 for the repairs, with a 20% down payment and the balance paid after the vessel was back in service. (Rec. Doc. 33, at 1-2).

On December 18, 2020, Superior Shipyard provided CJM with a Bid Letter outlining the projected work and a price of $310,503.00, which Mr. Fitch and Superior Shipyard's Bidding/Estimating Manager signed. (Rec. Doc. 27-4). The Bid Letter contained the same clause referring to the Vessel Owner's responsibility for all debts incurred. *Id.* at 2.

Superior Shipyard alleges that, shortly after executing the Bid Letter, Mr. Fitch stated that he wanted to proceed on a time and material ("T&M") basis, where Mr. Fitch would request to Superior Shipyard's foreman, Brent Leonard, the work to be performed on the M/V CECILE A. FITCH. Under the T&M arrangement, Leonard and Fitch would meet almost daily to discuss the work, Leonard would subsequently prepare hand-written daily field reports identifying the work performed, employees participating, and equipment and materials used, as well as the daily total cost of the work. At the bottom of each Daily Report was the notation, "This is a daily estimate

2

of work completed, not your invoice. There may be changes upon final review." (Rec. Doc. 27-6, at 1, 3, 5).

On January 4, 2021, the parties signed an additional bid letter for additional work on the vessel, at a price of $52,000.00. (Rec. Doc. 27-7). On July 30, 2021, Superior Shipyard issued an invoice to CJM listing descriptions of services and charges from November 20, 2020 to April 6, 2021. (Rec. Doc. 27-8). The total on the invoice was $585,432.13, minus a credit for payment of $13,318.90, leaving a balance of $572,113.23. *Id.* at 76. On April 1, 2022, Superior Shipyard sent CJM an invoice for dry docking and utilities from February 14, 2022 to March 31, 2022, for a total of $36,564.00.

On April 28, 2022, Superior Shipyard filed a complaint against CJM, alleging that the balance due for its services on the M/V CECILE A. FITCH in 2021 and 2022 is $608,677.23 and that CJM breached their contract. (Rec. Doc. 1). Superior Shipyard filed the instant motion for summary judgment on March 13, 2023, seeking recovery of all charges under the contract, judgment as a matter of law enforcing its maritime lien, or judgment as a matter of law enforcing the open account under Louisiana law. (Rec. Doc. 27-1, at 8-10). In response, CJM alleges that the only signed agreement between the parties indicates the cost of repairs of $310,504.00 rather than any amount indicated by a T&M contract. (Rec. Doc. 33, at 3). CJM alleges that Superior Shipyard did not do the work it billed CJM for, and instead Superior Shipyard unilaterally changed the agreement terms, allowed the vessel to be damaged in Hurricane Ida, and essentially abandoned the work on the vessel. *Id.* at 5-6.

## **LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See id.* at 325; *Little*, 37 F.3d at 1075

## DISCUSSION

The parties agree that they entered an agreement where Superior Shipyard would store and repair the M/V CECILE A. FITCH. However, the parties disagree on the terms of that contract, whether the parties fulfilled their obligations, and whether they modified the contract to an oral contract with different terms. Superior Shipyard argues that, although the parties' contract was later memorialized in the Bid Letter, at some point following Mr. Fitch's acceptance of the bid letter, Mr. Fitch decided to proceed on a T&M basis. (Rec. Doc. 27-1, at 7). However, CJM argues that, other than self-serving affidavits and daily invoices, Superior Shipyard offers no evidence establishing an agreement to shift to a T&M basis nor evidence that the work was actually performed. (Rec. Doc. 33, at 3). Thus, the issues before the Court are what the terms of the parties' agreement were, whether those terms can be enforced, and what (if any) amount CJM owes Superior Shipyard.

5

First, the Court notes that a contract for the repair of a vessel, like the agreement at issue in this case, is a maritime contract, governed by general maritime law. *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 412 (5th Cir. 1982). Superior Shipyard also moves for judgment as a matter of law according to the Louisiana statute pertaining to open accounts, La. R. S. § 9:2781. (Rec. Doc. 27-1, at 9). In this case, the general maritime law of contracts, not Louisiana state law, governs Superior Shipyard's claims for breach of the vessel repair agreement.

For maritime contract disputes, federal courts apply general principles of contract construction and interpretation "that can be found in treaties or restatements of the law." *Int'l Marine, L.L.C. v. FDT, L.L.C.*, 619 F. App'x 342, 349 (5th Cir. 2015). "[O]ral contracts are generally regarded as valid by maritime law." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 265 (5th Cir. 2011) (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961)). "Under general maritime law, terms and conditions contained in subsequently-issued purchase orders may supplement an oral agreement if there is evidence of a prior course of dealing between the parties from which a court may infer that the parties were aware of and consented to those additional contractual terms." *Id.* (citing Restatement (Second) of Contracts § 223(1) (1981) (defining "course of dealing" as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct")). In the ship repair industry, it is an industry practice and custom for the repair contractor to first do the repair work, then send a purchase order or

invoice containing the contract's terms and conditions after the repair work has begun or is completed. *Id.* (citing *B & B Schiffahrts GmbH & Co. v. Am. Diesel & Ship Repairs, Inc.*, 136 F. Supp. 2d 590, 592, 594–95 (E.D. La. 2001); *Hudson Waterways Corp. v. Coastal Marine Serv., Inc.*, 436 F. Supp. 597, 604 (E.D. Tex. 1977)). Further, "[w]here parties share a history of business dealings and standardized provisions have become part of those dealings, such familiar provisions ... issued after performance are binding if they are accepted without objection." *Campbell v. Sonat Offshore Drilling*, 979 F.2d 1115, 1120 (5th Cir.1992) (superseded by statute on other grounds)

In this case, the parties signed three documents memorializing their agreement for repairs to the CJM vessel in writing: (1) the November 20, 2020 Work Order that did not include a price, (2) the December 18, 2020 Bid Letter providing the price of $310,503.00, and (3) the additional Bid Letter on January 4, 2021 providing the price of $52,000.00. Outside of those written agreements totaling $362,503.00, Superior Shipyard alleges that Fitch decided to proceed on a T&M basis, such that CJM directed what work was to be done and when. (Rec. Doc. 27-1, at 7). In total, Superior Shipyard claims that the invoices for that repair work and storage fees total $608,677.23. (Rec. Docs. 27-1, at 7; 27-9; 27-11).

For the work it performed on a T&M basis, Superior Shipyard claims that it provided daily T&M reports emailed to Larry Fitch and Ranny Fitch, which, together with the Work Order, Bid Letters, and parties' conduct, formed a binding contract under maritime law. (Rec. Doc. 27-1, at 7). Brent Duet, Superior Shipyard's president,

stated in his affidavit: "although an initial work order was executed by the parties, followed by bid letters, again executed by the parties, Mr. Fitch, at the beginning of the job, decided he did not want to proceed on a bid basis, but rather the job would proceed on a time and material (T&M) basis." (Rec. Doc. 27-2, at 2). Superior Shipyard also provided the affidavit of Brent Leonard, its foreman, which also states that "Larry Fitch, the principal of Chester J. Marine, demanded that the repair work performed on M/V CECILE A FITCH be performed on a time and material ("T&M") basis." (Rec. Doc. 27-5, at 2). Both affidavits also note that Mr. Fitch was present at Superior Shipyard on a daily basis to direct what work was to be performed and when it was to be performed, and Mr. Leonard met with Mr. Fitch daily. (Rec. Docs. 27-2, at 2; 27-5, at 2)

CJM contests this claim because "logically, it makes no sense for CJM to enter into a time and material agreement because it had no money to pay for either time or material. Superior knew that CJM was strapped for cash and could only pay the balance of the estimated repairs after the vessel was back in service." (Rec. Doc. 33, at 3). Mr. Fitch's affidavit contradicts the Superior Shipyard affidavits and states that "at no time did Larry Fitch ever ask for or agree to any work to be performed on a 'time and material' basis." (Rec. Doc. 33-2, at 4). Mr. Fitch's affidavit also states that "the total amount of the entire contract for repairs should not have exceeded $310,503.00 after all work was completed." *Id.*

In support of its claim, Superior Shipyard also provided fourteen emails from its billing manager to Larry Fitch and Ranny Fitch, with attached "Daily Report"

8

invoices. (Rec. Docs. 27-6; 36-1). Eleven of those emails state, "Revised daily report due to BID cancellation." (Rec. Doc. 36-1, at 1). All of the emails state "Your daily T & M report for the vessel 'Cecile A. Fitch' is attached. This is not your final invoice only a daily summary for your convenience. . ." (Rec. Docs. 27-6, 36-1). Each "Daily Report" has a different date between December 2020 and April 2021 and includes an itemized list of repair work and prices, as well as a total price for the day. *Id.* The subject line of the emails also reflects the date of the attached daily report (i.e. the subject line of the email containing the January 9, 2021 daily report is "Cecile A Fitch - Daily Report – 1.09.21"). *Id.* Although each of the fourteen attached Daily Report includes a different date of the work performed, thirteen out of the fourteen emails are dated Thursday, January 14, 2021. *Id.*

    Considering the foregoing, the Court finds that the evidence Superior Shipyard provided would not entitle it to a directed verdict if the evidence went uncontroverted at trial. Specifically, genuine issues of material fact remain as to the total cost of work to which CJM and Superior Shipyard agreed, as well as whether an oral contract for repairs on a T&M basis ever occurred. Superior Shipyard alleges that a T&M contract occurred, as evidenced by employee affidavits and the Daily Report emails. However, this general allegation and the emails with attached invoices are not enough evidence for Superior Shipyard, as the moving party with the burden of proof at trial, to meet the summary judgment standard to show that the parties had an oral contract.

    First, CJM has presented evidence of the written contracts and an affidavit from Mr. Fitch declaring that the oral contract for repairs on a T&M basis never

occurred. Neither party provided evidence that CJM responded with or without objection to the Daily Report emails. "[T]he chief consideration when determining the validity of contractual terms ... is whether the party to be bound had reasonable notice of the terms at issue and whether the party manifested assent to those terms." *One Beacon Ins. Co.*, 648 F.3d at 269. Here, the evidence suggests that both parties signed written contracts evidencing a lower price, and Superior Shipyard did not send CJM and its officers the "Daily Reports" each day, providing an opportunity to object, but instead sent most of the invoices on a single day. The reports do not demonstrate to the Court that the parties agreed that the running total of the invoice's prices would supersede the parties' earlier agreed-upon price. Therefore, the Court finds that this evidence is not sufficient to show that CJM had reasonable notice of the contract terms at issue nor that it manifested assent to an oral contract on a T&M basis that would exceed the price to which it had previously agreed.

Second, Superior Shipyard provided no evidence of a prior course of dealing between the parties from which the Court may infer that the parties were aware of and consented to the oral contract or the terms contained in the subsequent invoices. Superior Shipyard does not allege that it had entered oral contract frequently with CJM in the past or that the parties had a continuing relationship that could establish a course of dealings. Thus, without previous conduct to demonstrate a course of dealings, the Court cannot infer acceptance or meeting of the minds on the T&M oral agreement and invoices, which arose subsequent to the parties' signed, written agreements contained in the record.

Finally, Superior Shipyard also asks the Court to disregard photographs of the vessel at Superior Shipyard provided by CJM as unauthenticated. Other than a set of photographs taken by Mr. Fitch on December 12, 2020, CJM does not identify who took the photographs of the vessel, under what circumstances, or how it obtained the photographs. The exhibits also include photos taken after the present suit was filed. The Court finds that CJM's unauthenticated photographs from on or about December 19, 2020 are improper summary judgment evidence. *See Duplantis v. Shell Offshore*, Inc., 948 F.2d 187, 191–192 (5th Cir.1991); *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

Drawing all reasonable inferences in favor of CJM, the Court finds that disputes remain as to the parties' vessel repair contract terms and the cost of the repair work. Accordingly,

## CONCLUSION

**IT IS HEREBY ORDERED** that Superior Shipyard's *Motion for Summary Judgment* **(Rec. Doc. 27)** is **DENIED.**

New Orleans, Louisiana, this 1st day of May, 2023.

*[signature]*
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

11