UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SUPERIOR SHIPYARD & FABRICATION, INC. | CIVIL ACTION |
| VERSUS | NO: 22-1169 |
| M/V CECILE A. FITCH, her engines, tackle, furniture, equipment, etc. in rem; AND CHESTER J. MARINE, LLC | SECTION: "J"(1) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This litigation arises from a vessel repair contract between Superior Shipyard & Fabrication, Inc. ("Superior Shipyard") and Chester J. Marine, LLC ("Chester J. Marine"). Superior Shipyard & Fabrication, Inc. ("Superior Shipyard") is a ship repair facility servicing the marine community for over 40 years from a shipyard located in Golden Meadow, Louisiana. Chester J. Marine, LLC ("Chester J. Marine") is a vessel owner which owns M/V CECILE A. FITCH. M/V CECILE A. FITCH is a twin-screw push boat, Official #297854, with dimensions 79.8' x 32' x 10'.

Larry Fitch is the owner of Chester J. Marine and is authorized to conduct business on its behalf. Ranny Fitch, the nephew of Larry Fitch, at material times herein was an employee and authorized representative of Chester J. Marine. Chester J. Marine and Superior Shipyard agreed that Superior Shipyard would provide repairs on M/V CECILE A. FITCH to be paid for by Chester J. Marine. Superior Shipyard performed vessel repair services from November 2020 through April 2021

to M/V CECILE A. FITCH. From April 2021 through the present, Superior Shipyard has stored the M/V CECILE A. FITCH.

This matter came on for a bench trial on the merits on June 5 and 6, 2023. At the conclusion of the trial, the Court took the matter under advisement. Upon consideration of all of the evidence and argument of counsel, and pursuant to Fed. R. Civ. P. Rule 52(a), the Court issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT

(1) Beginning in early November of 2020, the principal of Chester J. Marine, Larry Fitch, contacted Superior Shipyard to provide extensive repairs on M/V CECILE A. FITCH.

(2) In connection therewith, on November 20, 2020, a Work Order (Exhibit 8) was executed by Larry Fitch, on behalf of Chester J. Marine, providing, among other things, that:

> Vessel Owner and/or Operating Company authorizes the signing party to perform necessary work on their behalf to the above mentioned vessel. Vessel Owner and/or Operating Company accept full responsibility for all debts incurred from work authorized by signing party and agrees to pay debts incurred within net payment terms of customer's credit account.

(Exhibit 8).

(3) The Work Order also provides, through description of work, the notation, "complete repairs as directed."

(4) Further, the Work Order required that:

> [V]essel owner agrees to a service charge of one and a half (1.5) percent per month on the unpaid balance after thirty (30) days and the payment of reasonable attorney's fees and costs should the account be over ninety (90) days and placed in the hands of an attorney for collection.

(Exhibit 8).

(5) Larry Fitch signed the Work Order, binding Chester J. Marine to the terms thereof. Ranny Fitch, Larry Fitch's nephew and also an employee of Chester J. Marine, testified that he witnessed Larry Fitch sign the Work Order. The Court finds that Ranny Fitch's testimony is credible as an eyewitness to his uncle, Larry Fitch, signing the Work Order. Additionally, Chester J. Marine's handwriting expert's testimony is not binding or conclusive. In the circumstances here, the testimony of a credible eyewitness receives greater weight than that of an expert. Finally, the Court finds Brent Duet's, owner of Superior Shipyards, testimony that the work would not have begun without Mr. Fitch's signature to be persuasive. Therefore, the Court finds that the Work Order was signed by Larry Fitch and is enforceable against Chester J. Marine.

(6) On December 18, 2020, a bid letter (Exhibit 9) was provided to Chester J. Marine outlining the projected work at the time with a total bid price of $310,503.00. The bid letter was signed by Larry Fitch on behalf of Chester J. Marine and countersigned by Anthony Pitre on behalf of Superior Shipyard.

(7) Sometime in January of 2021, the decision was made to cancel the previous Bid and proceed with the repairs on a Time and Material ("T&M") basis. To proceed on a T&M basis, Chester J. Marine, through Mr. Fitch, would inform Superior Shipyard through its foreman, Brent Leonard, of the work it requested to be

performed on M/V CECILE A. FITCH. Mr. Fitch, and his nephew, Ranny Fitch, were at the shipyard on a daily basis to direct what repairs would be performed when. After their daily meetings and consistent with the work actually performed, Mr. Leonard prepared handwritten Daily Field Reports identifying the work performed, the employees performing the work and the equipment and materials used in connection with the work. Mr. Leonard would then forward the daily handwritten field reports (an example of which was submitted as Exhibit 3) to the Superior Shipyard's Accounts Receivable department where it would be typed into a Daily Report and emailed to Larry and Ranny Fitch. (Exhibits 1 and 2). The reports were also posted on the vessel where both Larry Fitch and Ranny Fitch would have access to a hard copy.

(8) At trial, there was conflicting testimony as to who initiated modifying the repair agreement to a T&M basis, but there is no doubt that this change occurred. In January 2021, Superior Shipyard's Accounts Receivable and Billing Manager, Toni Curole, compiled "Revised" Daily Reports for the December 2020 work performed prior to the change to a T&M basis. On January 14, 2021, she emailed those reports to Mr. Fitch, and Ranny Fitch. The January 14, 2021 emails, with attached daily reports, clearly note that the bid was cancelled and that the work was proceeding on a T&M basis. It strains credulity to believe that Larry Fitch did not understand and agree to this arrangement.

(9) Toni Curole continued to send emails and Daily Reports to both Larry and Ranny Fitch on an almost daily basis from January 2021 through April 2021. Both the

4

Daily Reports and Revised Daily Reports include the information contained in the field tickets, together with a daily total of costs incurred.

(10) Larry Fitch acknowledged that he received the emails and Daily Reports, which specifically stated that this is "[y]our daily T&M report." He also admitted he did not ask any questions or object to proceeding on a T&M basis.

(11) The Court is not persuaded that there was a purported oral agreement regarding payment for the repair work. Larry Fitch testified that the parties entered into an oral arrangement where Chester J. Marine would make a 20% down payment on the estimated cost of repairs, with the balance to be paid after the vessel was back in service and working. Outside of his self-serving testimony, there was no evidence at trial to support this statement. Furthermore, it is contradicted by the testimony of Mr. Duet, Mr. Leonard and Ranny Fitch to the effect that no such arrangement was ever suggested or agreed to.

(12) Superior Shipyard performed extensive work on the vessel from November 2020 through April 2021. Neither Larry Fitch nor Ranny Fitch complained about the work identified in the Revised Daily Reports or the Daily Reports or the cost of the work as projected therein.

(13) The Revised Daily Reports and the Daily Reports became the basis for Superior Shipyard's detailed invoices to Chester J. Marine. (Exhibit 4). On July 30, 2021, in line with the detailed invoice description, Superior Shipyard presented an invoice for payment to Chester J. Marine in the total amount of $585,432.13. (Exhibit 6). The invoice reflects that the subtotal was credited in the amount of

$13,318.90 to reflect a partial payment made by Chester J. Marine, leaving the balance due of $572,113.23.

(14) Subsequently, on April 1, 2022, Superior Shipyard invoiced Chester J. Marine in the amount of $36,564.00. (Exhibit 7). As established by the detailed invoice description (Exhibit 5), this invoice charges relate to dry-docking and utilities with a date of service from April 2021 to March 2022. However, there is no evidence of a discussion between the parties or any agreement that Superior Shipyard would provide those services to Chester J. Marine, so Court finds that Chester J. Marine is not obligated to pay the additional $36,564.00 for dry-docking and utilities.

(15) The Court further determines that defendants, Chester J. Marine and M/V CECILE A. FITCH, have not proven that they are entitled to any type of set-off from this amount.

## CONCLUSIONS OF LAW

(1) This Court has jurisdiction over this matter pursuant to its admiralty and maritime jurisdiction, 28 U.S.C. § 1333.

(2) The General Maritime Law applies to contracts "relating to a ship and its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment." *J.A.R., Inc. v. M/V Lady Lucille*, 963 F. 2d 96, 98 (5th Cir. 1992) (quoting *Thurmond v. Delta Well Surveyors*, 836 F. 2d 952, 954 (5th Cir. 1988)).

(3) A contract to repair a vessel is a maritime contract. *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products*, 448 F. 3d 760 (5th Cir. 2006).

(4) The interpretation of a maritime contract is a question of law. *Barrios v. Centaur*, 942 F. 3d 670 (5th Cir. 2019).

(5) The General Maritime Law generally regards written as well as oral contracts as being valid. *Kossick v. United Fruit Co.*, 365 U.S. 731 (1961).

(6) A plaintiff suing on a maritime contract, whether written or oral, is required to establish the basic elements of a contract, namely, offer, acceptance and consideration. *In re Tasch, Inc.*, 2002 W.L. 1973464 *3, 46 F. App'x 731 (5th Cir. 2002).

(7) Under the General Maritime Law, terms and conditions contained in subsequently-issued purchase orders may supplement an oral agreement if there is evidence of a prior course of dealings between the parties from which a court may infer that the parties were aware of and consented to those additional contract terms. *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F. 3d 258 (5th Cir. 2011).

(8) In the ship repair industry, it is an industry practice and custom for the repair contractor to first do the repair work, then send a purchase order or invoice containing the contract's terms and conditions after the repair work has begun or is completed. *B&B Schiffahrts GmbH & Co v. Am. Diesel & Ship Repairs, Inc.*, 136 F. Supp. 2d 590 (E.D. La. 2001). The chief consideration when determining the validity of contractual terms is whether the party to be bound had reasonable notice of the terms at issue and whether that party manifested assent to those terms. *One Beacon Ins. Co.*, 748 F. 3d at 269.

(9) Based on the documents introduced into evidence by the parties, the Court determines that a written agreement, evidenced by the Work Order (Exhibit 8), was entered into by Chester J. Marine and Superior Shipyard on November 20, 2022. The Work Order meets the formalities of a maritime contract in that there was an offer on the part of Superior Shipyard to do the work, acceptance of that offer by Chester J. Marine, and consideration in the form of Chester J. Marine's agreement to pay for all repairs performed by Superior Shipyard on M/V CECILE A. FITCH.

(10) The Court further finds, as is customary in the shipyard repair industry, the terms of the agreement were later modified by Chester J. Marine and Superior Shipyard to reflect specific scope of the work performed, the amount charged for that work performed, and that the agreement would proceed on a T&M basis. There is no evidence that at any time Chester J. Marine requested that the work stop. Further, there is also no evidence that the work performed as documented by the Revised Daily Reports and Daily Reports was ever challenged or declined by Chester J. Marine.

(11) Superior Shipyard and Chester J. Marine entered into the vessel repair contract, which is binding on the parties and fully enforceable.

(12) Pursuant to 46 U.S.C. § 31342, a "person providing necessaries to a vessel on the order of the owner or a person authorized by the owner: (1) has a maritime lien on the vessel; (2) may bring a civil action in rem to enforce the lien; and (3) is not required to allege or prove in the action that credit was given to the vessel."

(13)  The term "necessaries" includes repairs and supplies. *State Bank & Trust Co. v. Lil Al M/V*, 16-5053, 2017 W.L. 3265870, at *2 (E.D. La. Aug. 1, 2017).

(14)  To establish a maritime lien on a vessel, a plaintiff must show: (1) that it provided necessaries; (2) to a vessel; (3) on the order of the owner or agent. *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018); *Barcliff, LLC v. M/V Deep Blue, IMO No. 9215359*, 876 F. 3d 1063, 1068 (11th Cir. 2017).

(15)  Superior Shipyard has established a maritime lien for repair work performed and duly invoiced against M/V CECILE A. FITCH. Superior Shipyard provided: (1) ship repair work (a necessary); (2) to the vessel (M/V CECILE A. FITCH); and (3) on the order of the owner or agent (Larry Fitch on behalf of Chester J. Marine).

(16)  No defense to the establishment of a maritime lien has been offered on behalf of M/V CECILE A. FITCH.

(17)  Accordingly, Superior Shipyard's maritime lien is established in rem against M/V CECILE A. FITCH.

(18)  Because the Work Order is binding on Chester J. Marine, Chester J. Marine is also responsible for payment of reasonable attorney's fees and costs incurred in collection of the account.

(19)  The terms of the Work Order also state that Chester J. Marine is also indebted to Superior Shipyard for "a service charge of one and a half (1.5) percent per month on the unpaid balance after thirty (30) days." (Exhibit 8). The Court finds that an

interest rate of 1.5 percent per month is an unreasonable interest rate for a breach of repair contract.

(20) "Setting the rate of interest on a judgment is within the trial court's broad discretion." *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1029 (5th Cir. 1986). "The Fifth Circuit has upheld awards at the Louisiana legal rate, at the federal legal rate, as well as at, among other rates, higher rates roughly equal to the plaintiff's actual cost of borrowing." *Pillsbury Co. v. Midland Enters., Inc.*, 715 F.Supp. 738, 770–71 (E.D. La. 1989) (collecting cases). "[I]n this Circuit prejudgment interest is ordinarily awarded from the date of loss," because this "ensure[s] that the injured plaintiff is compensated for the use of funds to which the plaintiff was entitled, but which the defendant had use of prior to judgment." *Reeled Tubing*, 794 F.2d at 1028; *Sea Link Cargo Servs. Inc. v. Mar. Centre Inc.*, 380 F. App'x 460, 464 (5th Cir. 2010) (stating that "the date of injury, rather than the date of judicial demand," is the "proper date from which prejudgment interest should run").

(21) The Court finds that the date of loss to be July 30, 2021—the date Superior Shipyard sent the $572,113.23 invoice for the repair work. Considering the Court's broad discretion and the fact that the invoice does not contain a rate for prejudgment interest, the Court finds that Superior Shipyard is entitled to prejudgment interest at a rate of 6% per annum from July 30, 2021 until paid.

CONCLUSION

Judgment will be entered in favor of Superior Shipyard and against Chester J. Marine and M/V CECILE A. FITCH, together with interest from July 30, 2021 plus court costs. Additionally,

**IT IS HEREBY ORDERED** that, within 21 days entering of judgment, Superior Shipyard shall file a motion for attorney's fees and costs in accordance with Fed. R. Civ. Pro. 54(d)(2). Thereafter, Chester J. Marine shall have 7 days to file any response to the motion.

New Orleans, Louisiana, this 7th day of June, 2023.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE